**UNITED STATES of America,**

v.

**Anthony PUNGITORE, Jr.**

**Civil No. 96–7139, Criminal No. 88–00003–19.**

United States District Court, E.D. Pennsylvania.

May 20, 1997.

David E. Fritchey, Louis R. Pichini, Asst. U.S. Atty., Philadelphia, PA, for U.S.

Michael C. Schwartz, Philadelphia, PA, for defendant.

### MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

On November 19, 1988 Anthony Pungitore, Jr. was convicted by a jury in a major mafia trial of RICO and RICO Conspiracy, 18 U.S.C. §§ 1962(c), 1963. The jury specifically found him guilty of ten RICO predicate acts including one murder, two attempted murders, and three conspiracies to commit those murders. Post verdict motions were denied, and he was sentenced to a thirty year term of imprisonment on May 1, 1989. *United States v. Scarfo,* 711 F.Supp. 1315 (E.D.Pa.1989). Mr. Pungitore appealed his conviction, *United States v. Pungitore,* 910 F.2d 1084 (3d Cir.1990); it was affirmed and his petition for certiorari was denied. 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991).

On November 21, 1994, Mr. Pungitore filed a *pro se* motion to vacate his sentence pursuant to 28 U.S.C. § 2255. We dismissed this motion with a memorandum and order on December 28, 1994. An appeal was taken and the Third Circuit Court of Appeals vacated the dismissal and allowed Mr. Pungitore to amend and refile his petition raising new issues on September 21, 1995. No action was taken for more than a year and Mr. Pungitore finally filed a petition with this court for habeas corpus relief pursuant to 28 U.S.C. § 2255 on November 26, 1996. He filed a memorandum of law in support on January 18, 1997. The government responded via two memoranda, filed on January 6, 1997 and April 30, 1997. Due to the seriousness of his complaints and the factual conflicts inherent therein, we held a hearing with oral testimony on this matter on May 7, 1997 rather than relying solely on the affidavits. 28 U.S.C § 2246.

Mr. Pungitore claims in his November 26, 1996 petition that his trial counsel, Mr. Joseph Capone, Esq., provided him with ineffective assistance of counsel by refusing to permit him to testify, by refusing to present certain character witnesses, by refusing to cross-examine a witness with a prior inconsistent statement, by failing to move for a severance, and by failing to move for a mistrial; that there was a conflict of interest because of Mr. Capone's association with another lawyer that resulted in ineffective assistance of counsel; that there was insufficient evidence to justify his conviction; that the jury was improperly instructed; and that the consecutive sentences that he received for RICO and RICO Conspiracy violated the double jeopardy prohibition within the Fifth Amendment. We disagree. As the facts of this case have been much discussed by this court previously, *see Scarfo,* 711 F.Supp. 1315, we will not repeat ourselves.

## II. DISCUSSION

### A. *Ineffective Assistance of Counsel*

#### 1. **Standard**

■ The right to have the assistance of counsel is provided for in the Sixth Amendment of the United States Constitution. This right has been deemed fundamental by the Supreme Court; it cannot be denied to the defendant absent intentional and actual

waiver. *Johnson v. Zerbst,* 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938). The Supreme Court has set out a two-prong test to establish a claim of ineffectiveness of counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A petitioner must show both that: (1) his counsel's conduct was deficient, and "fell outside the wide range of professionally competent assistance" and (2) the petitioner was prejudiced as a result of that deficient conduct. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *United States v. DeRewal,* 10 F.3d 100, 104 (3d Cir.1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994).

■ To satisfy the first prong, deficiency, a petitioner must show that his counsel's conduct fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65. In evaluating such a claim, we "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. We may not use the benefit of hindsight to second-guess tactical decisions made by an attorney unless they are unreasonable. *See Id.* at 690, 104 S.Ct. at 2065–66; *Diggs v. Owens,* 833 F.2d 439, 444–45 (3d Cir.1987) ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential."), *cert. denied,* 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988). Moreover, the mere fact that a tactic has been unsuccessful does not necessarily indicate that it was unreasonable. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■ To guide us in determining the reasonableness of the attorney's performance, the Supreme Court in *Strickland* noted that the American Bar Association Standards may be referred to as a guideline. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65; *See also, Government of the Virgin Islands v. Weatherwax ("Weatherwax I")* 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II"),* 77 F.3d 1425, 1435

(3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 538, 136 L.Ed.2d 423 (1996).

■ One of the most relevant standards in this context is ABA Standard for Criminal Justice § 4–5.2 (3d ed.1993), "Control and Direction of the Case." This section dictates which decisions are ultimately to be made by the defendant, and which are to be made by the defense counsel. Specifically, strategic and tactical decisions such as which witnesses to call, whether to conduct cross-examination, and what trial motions to make are within the province of the attorney after consultation with the client. ABA Standard 4–5.2(b). The Commentary thereto states that when the attorney in question makes such strategic or tactical decisions, "[o]nly when [his] behavior revealed ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles [will these] actions amount to ineffective assistance of counsel." *Weatherwax I,* 20 F.3d at 579, *citing* Commentary at 4.67–68. Therefore, if a decision falls within the realm of "strategic decisions" to be made by the attorney, we will find whatever decision that attorney made to be sufficiently deficient *only* if he either failed completely to consult with his client, or if the decision was itself inept or incapable of interpretation as sound.

■ If the first prong is proven, a petitioner must also prove the second prong, prejudice. To show prejudice, a petitioner must show that there is a reasonable probability that there would have been a different outcome; that the deficient performance "deprived the defendant of a trial whose result is reliable." *DeRewal,* 10 F.3d at 104, *citing Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065–66. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We must examine the trial with our focus not on the outcome, but on whether the error so affected the adversarial balance that the trial was rendered unfair and the verdict rendered suspect. *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993).

### 2. Failure to Permit Mr. Pungitore to Testify

Mr. Pungitore first claims that Mr. Capone was ineffective by failing to properly advise Mr. Pungitore regarding his right to testify and by refusing to permit Mr. Pungitore to testify on his own behalf. *See Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 ("Petition Addendum")*, at 1.

The decision whether or not to testify is extremely important, and thus one left entirely to the defendant. ABA Standards for Criminal Justice, Standard 4–5.2; ABA Model Rule 1.2. While the defendant may and should receive advice from his attorney, this fundamental right cannot be contravened by an attorney even if the defendant's decision causes strategic damage. *See United States v. Teague*, 953 F.2d 1525 (11th Cir.), cert. denied, 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992).

However, Mr. Capone did not refuse to allow Mr. Pungitore to testify; rather, it was a decision that Mr. Pungitore voluntarily made himself. As Mr. Capone testified before us at the May 7, 1997 hearing, he and Mr. Pungitore discussed at length the decision to testify. He informed Mr. Pungitore of the risks involved with cross-examination and of setting himself apart from the unified defense strategy, and in the end, Mr. Pungitore himself decided not to testify. Mr. Capone also testified that had Mr. Pungitore insisted upon testifying, he would have called him to the stand; we credit this testimony.[1] Had Mr. Pungitore testified, he would have been faced with lengthy cross-examination by the government regarding his membership in La Cosa Nostra, his involvement in several murders, and an overwhelming amount of evidence against him. In a telling fashion, when presented again with the opportunity to testify before this court for the purposes of evaluating prejudice, in conjunction with the necessity of a thorough cross-examination, Mr. Pungitore again refused to take the stand. Mr. Capone's advice not to testify was reasonable given the facts; Mr. Pungitore's instant complaint is therefore meritless.

Moreover, any claim that a defendant in the instant case was not permitted to take

---

1. At the May 7, 1997 hearing, Mr. Pungitore attempted to introduce the testimony of Steven LaCheen, who had represented another defendant at the original trial. Objections for hearsay and relevance were brought. We sustained the objections and Mr. Pungitore's counsel made no offers of proof. However, because Mr. LaCheen repeatedly testified at the hearing that his entire memory of pertinent events was based on his affidavit built from contemporaneous notes to the file, we based our rulings on the substance contained therein. Specifically, the affidavit states that Mr. LaCheen heard the lead counsel for the *Scarfo* trial, Robert Simone, tell Mr. Pungitore that he was not permitted to testify. Petitioner's counsel argued that this was a verbal act, and therefore not hearsay; however, we disagree, and see no exception which would properly admit this evidence. A statement is a "verbal act" when the statement, itself affects the legal rights of the parties, or where "legal consequences flow from the fact that the words were said." *Blacks Law Dictionary* 1558 (6th ed.1990). We believe that because Mr. Simone was not Mr. Pungitore's counsel, his statement that Mr. Pungitore would not testify did not impact Mr. Pungitore's legal right to testify. Of course, Mr. Simone may have had a personal impact on Mr. Pungitore's decisions; however, as a third party, Mr. Simone's statements simply did not have the *legal* effect of denying Mr. Pungitore's right to decide whether to testify.

Even assuming that the testimony is not hearsay, we also find that it is irrelevant. The issue at this point is whether Mr. Capone provided ineffective assistance of counsel by refusing to permit Mr. Pungitore to testify; we hardly see the relevance of the statements, even adamant ones, of third persons. As stated, Mr. Simone was not Mr. Pungitore's counsel, and his effectiveness is not questioned here. If, for example, Mr. Pungitore's desire to testify had become overborne by his grandmother, evidence of that would not be relevant to the allegations of ineffective assistance of counsel made in his Section 2255 petition. Moreover, outside of an ineffective assistance claim, Mr. Pungitore could not successfully claim that Mr. Simone interceded to violate his Sixth Amendment right to testify directly because Mr. Simone was not (a) his counsel, (b) the prosecution, or (c) the court.

Finally, we note that even if we had admitted the testimony, and weighed it against Mr. Capone's testimony, our determinations of credibility would be such that our final decision would not be disturbed. We also wonder, if Mr. LaCheen actually witnessed the things he states in his affidavit, why he did not bring his claimed overwhelming concern that rights were being trampled to the attention of this court at the time when it seems that he would have had an ethical duty to do so.

**674**

the stand by his attorney despite expressing a desire to do so is contrary to the trial record. At the close of the defense case, the jury was excused and attorney Simone, who was acting as lead counsel for the defendants, stood in front of the bench and asked the following of all the defendants at the request of the court:

> With that, your Honor, we would move into evidence the exhibits that have been marked during the government's case, as well as those few that have been marked during the defense case, and I believe, if anybody disagrees with me raise their hand, I believe all of the defendants would rest, is that correct?

*Transcript,* November 9, 1988 at 110–11. We looked about the courtroom and as the record reflects, there was no response from anybody. The meaning of the question was clear and any defendant who wanted to testify could have so indicated at that time. As such, Mr. Pungitore's instant claim is completely without merit.

### 3. Failure to Present Character Witnesses

Mr. Pungitore next argues that Mr. Capone was ineffective by refusing to present certain character witnesses on Mr. Pungitore's behalf. *Petition Addendum* at 1. Specifically, Mr. Pungitore points to Father William Harrison, Dr. Alfred Iezzi, Mr. George Cirillo, and Mr. William Schultz as character witnesses who would have testified.

■■■ The decisions of which witnesses to call to testify are strategic and therefore left to counsel. See ABA Standards of Criminal Justice, Standard 4–5.2; *Diggs,* 833 F.2d at 446. Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case. *United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir.1990); *see also United States v. Griffin,* 1993 WL 34927 (E.D.Pa.) (Feb. 9, 1993), *aff'd,* 16 F.3d 406 (3d Cir.1993). Indeed, this is precisely the type of strategic decision

which the Court in *Strickland* held to be protected from second-guessing. *See Sanders v. Trickey,* 875 F.2d 205, 212 (8th Cir.), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989). "Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation." *United States v. Vincent,* 758 F.2d 379, 382 (9th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).

■■■ Nevertheless, Mr. Capone testified at the May 7, 1997 hearing that Mr. Pungitore himself, after being presented with the realities of presenting certain witnesses and the advice of counsel that evidence which distinguished certain defendants would weaken the overall unified defense strategy and therefore lessen the chances for an acquittal, decided not to present those witnesses. *Transcript,* 5/7/97 at 17–18. He stated that had Mr. Pungitore insisted, despite the fact that it was a strategic decision, he would have called those witnesses. We credit this testimony in the absence of evidence to the contrary above and beyond Mr. Pungitore's affidavit. Mr. Pungitore has therefore not shown error on the part of Mr. Capone, and we need not address ourselves to prejudice.[2]

### 4. Failure to Cross–Examine Thomas DelGiorno with Prior Inconsistent Statements

Mr. Pungitore's next argument is twofold. He alleges first that government witness Thomas DelGiorno made statements on the witness stand which were inconsistent to statements he made during his initial debriefing. He then argues that it was ineffective assistance of counsel for Mr. Capone to fail to cross-examine Mr. DelGiorno regarding the aforementioned statements. *Petition Addendum* at 1. As such, this complaint necessarily rises and falls on the question of whether Mr. DelGiorno testified inconsistently.

The crux of Mr. Pungitore's claim is that Mr. DelGiorno made an initial statement to the New Jersey State Police that was record-

---

**2.** We note, though, that each of these witnesses did present their testimony appropriately at sentencing, albeit unsworn, and their character assessments were considered at that time. Having reviewed that testimony, we believe that there would have been no prejudice because of the overwhelming amount of evidence presented against Mr. Pungitore during the trial.

ed on audio tape. At some point in this statement, which is attached to Mr. Pungitore's Petition as Exhibit A, Mr. DelGiorno stated that "Anthony [Pungitore] was carried." Mr. DelGiorno went on to explain that to be "carried" into membership in the Mafia, a person would usually be related to a made member, and would therefore not be required to actually shoot someone to gain admittance. Instead, they could participate in a more minor way without having to pull the trigger or be the one who kills. *Petition,* Exhibit A at 13. At trial, Mr. DelGiorno testified that Mr. Pungitore conspired to kill Steven Vento, Jr. and shot into his car. *Transcript,* 10/13/88 at 6–9. Specifically, Mr. DelGiorno testified that Mr. Pungitore "said that he shot three times into the car, he said, but he don't know what happened, why he missed." *Transcript,* 10/13/88 at 9. He testified that Mr. Pungitore was "used" for this attempt because the Mafia was "getting ready to make [him] anyway." *Transcript,* 10/13/88 at 6.

These statements are not inconsistent. All DelGiorno said to the New Jersey State Police was that Mr. Pungitore had not been required to kill someone to become a made member. The crime which qualified Mr. Pungitore to be admitted, as Mr. DelGiorno later testified, involved the attempted murder of Mr. Vento, in which Mr. Pungitore fired shots into Mr. Vento's car. This involvement was insufficient for most people to gain admittance to the Mafia, but was sufficient for Mr. Pungitore to be, and was certainly sufficient to sustain the conspiracy and attempted murder charges of which Mr. Pungitore was eventually convicted. Moreover, the earlier testimony is also not exculpatory; it is clear that given the opportunity to expound on the various ways one can be "car-

ried," Mr. DelGiorno would have done so in an extremely *inculpatory* manner.

Even if the statements Mr. DelGiorno made were to any extent exculpatory or inconsistent, whether and how to conduct cross-examinations are tactical decisions that fall squarely within the domain of the attorney. ABA Standards § 4–5.2(b); *See Comment* to ABA Model Rule 1.2; *Weatherwax II,* 77 F.3d at 1433. Certainly, given the above discussion, Mr. Capone's decision to not cross examine Mr. DelGiorno was reasonable. According to Mr. Capone's affidavit, the strategy involved with Mr. DelGiorno as well as all the other government witnesses was to "show[ ] them to be repulsive liars, killers and amoral persons who would do anything to promote their selfish interests and save themselves. Additionally, their plea agreements with the government were attacked as being sweetheart deals that rewarded them excessively and essentially bought their testimony." *Capone Affidavit,* at 3. It would have been disastrous to have allowed Mr. DelGiorno the chance to explain any discrepancies.

Mr. Capone further testified at the May 7, 1997 hearing that he believed that the statements were not inconsistent, that the New Jersey State Police tape was far more damaging if played in open court and therefore every effort was made to avoid that, and that the statements were not exculpatory—noting specifically that "contrary to the suggestion in the § 2255 motion, being carried did not mean that one had failed to participate in the murder in a fashion sufficient to be legally culpable but rather it meant that the person did not fire the bullet that struck and killed the victim." *Transcript,* 5/7/97 at 19. We credit this testimony, as we do the testimony that after explaining the problems with this cross-examination, Mr. Pungitore agreed to the strategy.[3] *Transcript,* 5/7/97 at 20. Cer-

---

3. At the May 7, 1997 hearing, Mr. Pungitore also attempted to introduce the testimony of Mr. LaCheen about a conversation between Mr. Capone and Mr. Pungitore. Although a proffer was not made, we continue to assume due to Mr. LaCheen's repeated references to his affidavit that the events transcribed therein would have been the substance of his testimony. Mr. LaCheen would have testified that after court proceedings "one day," "Mr. Pungitore reminded Mr. Capone about the proposed cross-examination concern-

ing DelGiorno's statement about Pungitore, to which Mr. Capone responded, 'I'll ask Bobby,' referring to Attorney Robert Simone." Petition, Exhibit C at 3. Again, we reaffirm our holding that this testimony is hearsay, and not a verbal act, as this statement had no direct and actual impact on Mr. Pungitore's legal rights or status. First, there is no indication that there is a direct denial of cross-examination, and second, Mr. Pungitore had no legal right to any particular form of cross-examination. The argument that

tainly, Mr. Capone's decision to not cross-examine Mr. DelGiorno on this issue in light of these circumstances was reasonable and not deficient.

### 5. Failure to Move for Severance

Mr. Pungitore next claims that Mr. Capone adopted a trial strategy which was prejudicial to Mr. Pungitore and provided ineffective assistance by failing to move for severance at any point before or during the trial. He points to "the potential dangers associated with lead counsel's [Mr. Robert Simone, Esq.] being an unindicted coconspirator," and argues that because Mr. Simone was at various points referred to by government witnesses as being involved in the criminal activity of the defendants, the failure to move for severance amounts to ineffective assistance of counsel. *Petition Addendum* at 2.

▇▇ The decision of whether to make a motion falls clearly within the realm of "attorney decisions." *See Weatherwax II,* 77 F.3d at 1435. To overcome the presumption that his counsel's actions were within the objective standard of reasonableness, Mr. Pungitore must show that Mr. Capone's decision to not move for severance was unsound trial strategy. *See Darden v. Wainwright,* 477 U.S. 168, 169, 106 S.Ct. 2464, 2465–66, 91 L.Ed.2d 144 (1986). If there exist good strategic reasons for his decision, we may not find Mr. Capone ineffective merely because we may have made a different choice.

▇▇ In his affidavit and at the May 7, 1997 hearing, Mr. Capone stated that he considered the possibility of moving for severance, and decided against it. He stated as his reasons the fact that it was improbable that the motion would be granted given the complexity of the case and co-defendant Joseph Pungitore's failure with the same motion, and his opinion that an overall unified defense strategy would be far more effective. *Capone Affidavit,* at 8–9; *Transcript,* 5/7/97

at 20–21. He stated that it was his feeling that a motion to sever would have been frivolous and that "it is hornbook law that judicial economy favors a joint trial where the defendants are indicted together and charged with a single conspiracy." *Capone Affidavit* at 8; *Transcript,* 5/7/97 at 20–21. Also, Mr. Capone knew that within the year preceding the instant trial, the unified defense strategy with Mr. Simone as lead counsel and where the destruction of the credibility of the cooperating witnesses was the cornerstone of the defense had twice been successful for the defendants, many of whom were presently charged. *Capone Affidavit* at 2–4; *Transcript* 5/7/97 at 12–14.

▇▇ This circuit has repeatedly held that "effective assistance does not demand that every possible motion be filed, but only those having a solid foundation." *United States v. Swinehart,* 617 F.2d 336, 341 (3d Cir.1980); *United States v. Hines,* 470 F.2d 225, 232 (3d Cir.1972), *cert. denied,* 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973). Motions to sever are disfavored in complex cases. The instant case involved seventeen defendants, ten counts including forty racketeering acts, and lasted for fifty-three trial days. It was indeed the epitome of a very long and complex case. Mr. Pungitore's co-defendant Joseph Pungitore had already filed a pretrial motion for severance which had been denied by the court. That denial was ultimately affirmed on post-verdict motions. *United States v. Scarfo,* 711 F.Supp. 1315, 1340–42 (E.D.Pa.1989), *aff'd, United States v. Pungitore,* 910 F.2d 1084 (3d Cir.1990). Most importantly, the seventeen defense counsel involved in this case elected to pursue an overall unified defense strategy which consisted primarily of denying the existence and criminal purpose of the La Cosa Nostra, denying the defendants' participation in it, and denying the credibility of the government's principal cooperating witnesses. In light of this, Mr. Capone's decision was not

---

the statement goes to present sense or state of mind is misplaced; this is not the situation those exceptions are designed to address. Moreover, even if an exception was applicable, and the testimony were to be credited, we fail to see the relevance or import of such a comment in light of the cooperative effort of the attorneys in this

unified defense case. Finally, we again note that if, contrary to the outward appearance, Mr. La-Cheen truly felt that Mr. Pungitore was receiving less than effective assistance of counsel during the trial, we are troubled by his decision to avoid his ethical duty to present these concerns to us at the time.

only not unreasonable; on the contrary, it was a deliberate tactical decision well within the bounds of reasonable professional assistance.

### 6. Failure to Move for a Mistrial

Mr. Pungitore states as his final ineffective assistance allegation that Mr. Capone failed to move for a mistrial or seek curative instructions both when Mr. DelGiorno testified that Mr. Simone wanted Mr. DelGiorno to kill a co-conspirator, and when government witness Nicholas Caramandi testified that Mr. Simone and Defendant Nicodemo Scarfo had ordered Mr. Caramandi killed. *Petition Addendum*, at 2

Specifically, Mr. Pungitore refers to October 13, 1988, when Mr. DelGiorno testified about the extortion of developer Willard Rouse. Soon after Mr. Caramandi, Robert Rego and Leland Beloff were arrested in connection with that extortion, Mr. DelGiorno testified that he and Mr. Simone had a conversation in which Mr. Simone repeatedly told Mr. DelGiorno that Mr. Rego could "really, really hurt" him. *Transcript*, 10/13/88 at 34. Mr. DelGiorno said that he interpreted this to mean that Mr. Simone wanted Mr. Rego to be killed. Mr. Simone objected at that point and asked that the testimony be stricken; we struck the testimony, and the direct examination continued. In addition, he refers to Saturday, October 29, 1988 during Mr. Caramandi's direct testimony, when Mr. Pichini asked, "what was the reason that you cooperated?" and Mr. Caramandi responded, "Scarfo and Bobby Simone were going to kill me." *Transcript*, 10/29/88, at 126. The transcript notes that following this answer there was laughter in the courtroom, to the extent that we felt it necessary to note that, "this is a court of law and I am not going to tolerate that type of an outburst." *Id.* The following Monday, October 31, 1988 a discussion was held at sidebar; after a discussion of some housekeeping matters, Mr. Simone mentioned that Mr. Pichini had approached him about re-questioning Mr. Caramandi because Mr. Caramandi had never before indicated that Mr. Simone wanted him killed. Mr. Simone pointed out that if the matter were not "cleaned up" it might be

grounds for a mistrial, and Mr. Pichini subsequently acted to secure Mr. Caramandi's retraction of his earlier accusation before cross-examination began. *Transcript*, 10/31/88 at 4–9.

Again, we note that the decision to file motions are within the area of decisions to be made by the attorney, and that we will not find ineffective assistance of counsel for failure to make motions destined to fail. *Swinehart*, 617 F.2d at 341; *Weatherwax II*, 77 F.3d at 1435. If Mr. Capone's decision to not file a motion for a mistrial was sound trial strategy, Mr. Pungitore cannot demonstrate ineffectiveness. *Darden*, 477 U.S. at 169, 106 S.Ct. at 2465–66.

In the instant case, Mr. Capone stated in both his affidavit and at the May 7, 1997 hearing that both instances were perceived by the defense team to damage the government witnesses' credibility because it was clear that they had lied and that the government was embarrassed by their answers, and "it made no sense to request a mistrial where government witnesses had made statements that appeared to hurt the government's case rather than the defense's. A mistrial would have meant a retrial at which DelGiorno and Caramandi may have testified more soberly. An acquittal would have discharged my client." *Capone Affidavit*, at 9; *Transcript*, 5/7/97 at 21–22. We credit this testimony and note that no other defense counsel moved for a mistrial at the conclusion of these events either. Clearly, the motions would have been frivolous, and it cannot be ineffective assistance of counsel to refuse to make a frivolous motion.

### B. Conflict of Interest

Mr. Pungitore makes a separate claim of ineffective assistance arising from his allegation that Mr. Capone and Mr. Simone were associated in the practice of law and that Mr. Capone had represented co-defendant Mr. Scarfo on previous occasions. Based on these alleged associations Mr. Pungitore alleges that Mr. Capone's financial and professional dependence on Mr. Simone prevented him from exercising independent professional judgment regarding Mr. Pungitore's defense strategy. *Petition Addendum*, at 2.

This is an extremely serious allegation, and we will consider it carefully. However, this is the exact same claim that Mr. Pungitore raised on direct appeal: "that Capone's financial and professional dependance on Simone prevented him from exercising independent professional judgement regarding Pungitore's defense strategy." *Pungitore,* 910 F.2d at 1139. There, the Third Circuit held that this complaint held no merit and that this court was not in error for failing to hold a full Rule 44(c) hearing. *Id.* at 1139–1144. In addition, the Third Circuit noted that our conclusions that Mr. Simone and Mr. Capone were not associated practitioners were "fully supported by the record." *Id.* at 1140.

■ To the extent that this issue was already litigated on direct appeal, we exercise our discretion to decline to reconsider it in a Section 2255 petition. *United States v. Orejuela,* 639 F.2d 1055, 1057 (3d Cir.1981) (*citing Kaufman v. United States,* 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 1074 n. 8, 22 L.Ed.2d 227 (1969)). For reasons of clarity, though, we will discuss the matter briefly. We note that even if Mr. Capone did by his associations with Mr. Simone possess any conflict of interest, this was waived by Mr. Pungitore at trial. On September 8, 1988, after a number of colloquies concerning the various conflicts of interest were held and the conflicts waived in open court, Mr. Simone presented the following to the court:

MR. PICHINI: There is an issue, Your Honor, of Mr. Capone (inaudible) share some office space relationship and I think we have to get on the record exactly what that relationship is and also as Mr. Scarfo, who's represented obviously by Mr. Simone and I believe it's Mr. Pungitore who's represented by Mr. Capone, that they understand this and that there's no objections.

THE COURT: All right. Get that out of the way.

MR. SIMONE: Your Honor, for the record, Robert Simone. I'm representing Mr. Scarfo. I also represented other defendants in this case and in other matters. Joseph Capone also, I'm happy to say, graduated Temple University, and I hope you'll remember that, Judge, became associated with my office on a full time basis in approximately January of this year. Mr. Capone has his own office in the same building, which I rent, for your information. I don't own it. Mr. Capone has his own secretary [and] who does quite a bit of legal work for me not as an employee, but as an associate. I pay him for the work that he does. I do not deduct taxes. He pays his own taxes. He has his own practice which I do not participate in. He—he has—he's a member of the Philadelphia and New Jersey bar. We are not partners. He's not my employee, but we do work together on many cases. Mr. Scarfo has been made aware of that from the beginning from the time Mr. Capone first came with me. Mr. Anthony Pungitore has been made aware of that from the time Mr. Capone first became associated with me. Mr. Capone has ordered, having nothing to do with this case, his own stationery. I'm not sure that he's look—that he's gotten it yet, but I know he has his own stationery and that's not for the purposes of this case, but for the purposes of his own practice. When Mr. Pungitore was—who were you represented by, Mr.— oh, yeah, he was represented by another lawyer at one time. What's his name? Robert Mozenter. And, Robert Mozenter, for some reason or another, could not undertake this case because of the length of time or whatever and he wrote Mr. Pungitore a letter saying I'm sorry, I can't represent you. His appearance was in. Mr. Pungitore—Anthony Pungitore sought other counsel. I told him I couldn't represent him because of the conflict and viably, I introduced him to Mr. Capone. They spoke themselves and he—he retained Mr. Capone. I kept Mr. Pichini aware of this. I alerted to the potential conflict. I've alerted to Mr. Pungitore and Mr. Scarfo. There is no conflict for all intents and purposes. Mr. Capone will be representing Mr. Pungitore. I will be representing Mr. Scarfo. It's that simple. As far as Mr. Pichini's statement about other defendants talking to other lawyers and not divulging, for the record, I want the government to know these guys are together

and we are sharing information and we will continue to share information. All the defendants have agreed to that, so I don't think we need to go into that. Every defendant in this case has authorized their lawyer to speak to every other lawyer about everything that's been said. So, Mr. Pungitore has agreed to that and Mr. Scarfo has agreed to that and I can't see any need to go any further with it, but whatever else the Court

\* \* \* \* \* \*

THE COURT: And, you don't foresee anything arising in this trial in which the interest of your client would be adverse to those of Mr. Capone?

MR. SIMONE: No, sir.

THE COURT: Mr. Scarfo, I'll have to ask you if you agree with what your attorney has just said, sir?

MR. SCARFO: I agree with him.

THE COURT: You agree with it. All right.

MR. A. PUNGITORE: I agree with him.

THE COURT: You agree with that, sir? Mr. Capone, you agree with the representations made by Mr. Simone?

MR. CAPONE: Of course, Your Honor.

THE COURT: All right.

*Transcript*, 9/8/88 at 47–50.

In addition, a few minutes later, Mr. Simone informed the court of various other possible conflicts that had been made known to all defendants. We asked, "is there any defendant that does not agree with what Mr. Scarfo has said? Any counsel that does not agree with it?" When the defendants remained silent or shook their heads "no," we said, "all right. Thank you." *Id.* at 60. Clearly, all connections between Mr. Simone and Mr. Capone had been made clear to Mr. Pungitore, and Mr. Pungitore affirmatively indicated to this court that he waived any objections thereto. *See Pungitore*, 910 F.2d at 1140.

■ Because there are often many potential conflicts between private counsel in multi-defendant trials, "in order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of inter-

est adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). An actual conflict of interest occurs if "the defendants' interests diverge with respect to a material factual or legal issue or to a course of action such that the attorney finds himself in the untenable position of serving two clients with incompatible needs." *Pungitore*, 910 F.2d at 1141 (*citing United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989)). If this is affirmatively shown by the petitioner, the error prong of the *Strickland* standard is shown, and the prejudice prong will be presumed.

■ Mr. Pungitore has not met his burden to show an actual conflict. Mr. Capone testified at the May 7, 1997 hearing that his name was on Mr. Simone's letterhead briefly, and that as a young lawyer he had looked to Mr. Simone for assistance in starting his own law practice; however, this does not create an actual conflict of interest which affected his performance as Mr. Pungitore's attorney. Mr. Capone further testified that, "although I did have a profitable business relationship with Robert Simone, Esquire, that fact did not in any way compromise my fidelity to Anthony Pungitore, Jr., as a client nor alter the advice I gave him." We credit this testimony. Mr. Pungitore has not presented any credible testimony that Mr. Capone suffered from an actual conflict which adversely affected the representation he provided. Mr. Capone testified that, "I believe that I represented [Mr. Pungitore] honorably and to the best of my ability. While we were both disappointed with the outcome of the case, that outcome was the result of the volume of evidence presented by the Government, not of an unsound defense strategy." *Transcript*, 5/7/97 at 23. As discussed above, the unified defense strategy led by Mr. Simone had been twice successful in two prior cases; there is no evidence that Mr. Capone agreed to this same strategy for the instant. case out of anything other than reasoned, able lawyering with his client's interests at heart.

### C. Insufficiency of the Evidence and Erroneous Jury Instruction

#### 1. Sufficiency of the Evidence

Mr. Pungitore next claims that the evidence established against him at trial is insufficient to support a conviction under 18 U.S.C. § 1962(c) in light of the Supreme Court's recent decision of *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). *Petition Addendum*, at 3. The *Reves* court held that Section 1962(c) liability was merited only when the evidence showed that the individual "participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 183, 113 S.Ct. at 1172. We disagree.

■ Mr. Pungitore's claim must be rejected for several reasons. Generally, sufficiency of the evidence questions are not cognizable on habeas corpus petitions. *See Houser v. United States*, 508 F.2d 509, 515 (8th Cir.1974); *Forrester v. United States*, 456 F.2d 905, 907 (5th Cir.), *cert. denied*, 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101 (1972); *United States v. Osborn*, 415 F.2d 1021, 1024 (6th Cir.1969) (en banc), *cert. denied*, 396 U.S. 1015, 90 S.Ct. 567, 24 L.Ed.2d 506 (1970); *United States v. Washington*, 287 F.2d 819, 821 (7th Cir.), *cert. denied*, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259 (1961). *See also, Sunal v. Large*, 332 U.S. 174, 179, 67 S.Ct. 1588, 1591, 91 L.Ed. 1982 (1947) (stating that "the writ is not designed for collateral review of ... the existence of any evidence to support the conviction"); *United States v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979) (noting that "unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained far more limited"). Our inquiry should instead be directed to "whether the verdict of guilty was so devoid of evidentiary support as to raise a due process issue." *Lorraine v. United States*, 444 F.2d 1, 2 (10th Cir.1971).

■ However, before we reach the discussion of whether the evidence presented was insufficient to the point of causing Constitutional problems, we note that Mr. Pungitore's claim is both procedurally barred, and based on new law.

The Supreme Court has held that if a Section 2255 petitioner failed to properly raise an issue in trial or on direct appeal, he will be procedurally barred from raising the issue in a collateral attack unless he can show cause and actual prejudice. *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982); *United States v. Essig*, 10 F.3d 968, 979 (3d Cir.1993). To show "cause," a petitioner must demonstrate that the reason for failing to raise the issue is something that cannot be fairly attributable to him, and to show "actual prejudice," a petitioner must establish that any errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension. *Frady*, 456 U.S. at 167–69, 102 S.Ct. at 1594–95.

In the instant case, Mr. Pungitore had the opportunity to raise sufficiency of the evidence questions in his direct appeal, but did not. Cause is not shown by the fact that the *Reves* case had not yet been brought to the Supreme Court, because that did not make the argument futile. *See, Napoli v. United States*, ("*Napoli I*"), 32 F.3d 31, 37 (2nd Cir.1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). However, we need even not reach the "cause" prong, because an examination of the appellate court decision and the actual evidence presented in the case, *infra*, shows there to be no actual prejudice to Mr. Pungitore.

As the Third Circuit noted in the direct appeal for this case, "with few exceptions, appellants understandably have not challenged the sufficiency of the evidence to support their convictions." *United States v. Pungitore*, 910 F.2d 1084, 1099 (3d Cir.1990). The court went on to review the facts of the case "so as to convey a sense of the extraordinary breadth of the evidence the jury had before it of appellants' criminal activity in Pennsylvania and Southern New Jersey." *Id.* Given this statement by the Court of Appeals, it is difficult to imagine that Mr. Pungitore has suffered any actual prejudice by his failure to raise the matter on appeal.

■ However, even if we did decide to use our discretion to review the sufficiency of the evidence against Mr. Pungitore, his claim

would still be unavailing. Mr. Pungitore alleges that we should review the evidence in light of the Supreme Court's decision in *Reves*. *Reves*, though, was not decided until 1993, after Mr. Pungitore's case had been fully and finally litigated. The Supreme Court has created separate retroactivity standards for new rules of criminal procedure and new decisions of substantive criminal law. For situations where there has been a change of substantive criminal law, the Supreme Court articulated the standard that "the appropriate inquiry is whether the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice, and whether it presents exceptional circumstances where the need for the remedy afforded by collateral relief is apparent." *United States v. Woods*, 986 F.2d 669, 676 (3d Cir.) (*quoting Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974)), *cert. denied*, 510 U.S. 826, 114 S.Ct. 90, 126 L.Ed.2d 58 (1993).[4]

In the instant case, it is clear that injustice will not result from the non-retroactive nature of the new rule; there is no fundamental defect now in Mr. Pungitore's conviction. The *Reves* case held, as we have already discussed, that the language "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" in 18 U.S.C. § 1962(c) means that for a defendant to be held liable thereunder, he must have "participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 185, 113 S.Ct. at 1173. The court also noted that "an enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." *Id.* Further, the Court declined to discuss "how far § 1962(c) extends down the ladder of operation." *Id.* at n. 9.

By his own admission, Mr. Pungitore was an insider, a made soldier in La Cosa Nostra, who "followed orders and participated in efforts to locate Harry Riccobene, acted as a 'blocker' in an attempt on Robert Riccobene's life, and shot at Stephen Vento." *Petitioner's Memorandum in Support of Motion to Vacate Sentence Under 28 U.S.C. § 2255* at 11. Mr. Pungitore clearly would not have been excluded from liability had the "operation or management" standard been applied at trial because the evidence plainly demonstrated that he was at the very least a lower-rung insider who acted at the direction of the "upper management." *See United States v. Oreto*, 37 F.3d 739, 750–51 (1st Cir.1994) (stating that there is a difference between *Reves'* concern with horizontal connections and liability for vertical connections within the organization, that defendants were liable by being "plainly integral to carrying out the [orders from above]" and that "Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers"), *cert. denied*, 513 U.S. 1177, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995).

For this same reason, even if we were to apply *Reves* retroactively to the instant case, and examine the sufficiency of the evidence under the new standard, there is no reason to believe that the outcome would have been any different. "The extraordinary breadth of the evidence," *Pungitore*, 910 F.2d at 1099, demonstrated what Mr. Pungitore admits to be true: while he was not the boss of La Cosa Nostra, he was a made member who acted at the direction of Mr. Scarfo and the upper management of the Mafia, and knowingly implemented their policies. Ergo, Mr. Pungitore is liable under 18 U.S.C. § 1962(c) under either standard.

The cases which Mr. Pungitore cites are inapposite. *Jaguar Cars, Inc. v. Royal Oaks*

---

4. This varies from the retroactivity standard created for new rules of criminal procedure as established in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion): generally non-retroactive in habeas corpus cases, with the narrow exceptions if the new rule places "certain kinds of primary private individual conduct beyond the power of the criminal law-making authority to proscribe" and if "it requires the observance of those procedures that ... are implicit in the concept of ordered liberty." *Teague* 489 U.S. at 307, 109 S.Ct. at 1073. Even if the new decision in *Reves* established a new rule of procedure, we find that Mr. Pungitore's case does not meet the requirements of the exceptions, and the decision should not be applied retroactively.

*Motor Car Co.,* 46 F.3d 258 (3d Cir.1995) involved a civil RICO action, and noted that *Reves* made an important distinction between outsiders and insiders in terms of liability; it held that when officers and employees who operate and manage a corporation use the corporation to commit acts in violation of RICO, they are personally liable under § 1962(c). *Jaguar* 46 F.3d at 267. It could not be plainer that *Reves* has no relevance to the prosecution of insiders as opposed to outsiders. *See, United States v. Gabriele,* 63 F.3d 61, 68 (1st Cir.1995). *United States v. Viola,* 35 F.3d 37 (2nd Cir.1994), another case cited by Mr. Pungitore, involved an individual who was the "kingpin's" handyman who did odd jobs and very likely had no awareness of the larger organization. Mr. Pungitore simply cannot claim, in light of the evidence presented against him at trial, this level of naivete. He was not "sweeping the floor" beneath the ladder of operations, *Viola,* 35 F.3d at 43, but was instead an insider, a made member of the Mafia heavily involved in the carrying out of several murders, extortions, and other business of the Mob.

## 2. Jury Instructions

Mr. Pungitore also claims that he is entitled to a new trial because the jury instructions we gave did not reflect the language which *Reves* now requires. *Petition Addendum,* at 3. For many of the same reasons as discussed more fully above, we disagree.

▮ First, errors such as improper jury instructions are generally not cognizable on a collateral attack unless they are of constitutional magnitude or "a fundamental defect which inherently results in the complete miscarriage of justice." *Reed v. Farley,* 512 U.S. 339, 348, 114 S.Ct. 2291, 2297, 129 L.Ed.2d 277 (1994) (*quoting Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962); *Merrill v. United States,* 599 F.2d 240, 243 (8th Cir.1979); *Houser,* 508 F.2d at 516–17.) Such a magnitude of error is not present here.

▮ Moreover, even if we did decide that we would exercise our discretion to hear error in jury instructions, Mr. Pungitore did not raise the matter on direct appeal, and is therefore procedurally barred unless he can show cause and prejudice. *See Frady,* 456 U.S. at 167–68, 102 S.Ct. at 1594–95; *Essig,* 10 F.3d at 979. We need not determine whether cause has been established if Mr. Pungitore fails to demonstrate actual prejudice by showing that the instruction "so infected the trial that the resulting conviction violates due process." *United States v. Flynn,* 87 F.3d 996, 999 (8th Cir.1996) (*quoting Frady,* 456 U.S. at 169, 102 S.Ct. at 1595). At trial, we paused several times throughout our instruction to the jury to hear objections and questions from all attorneys, *see, e.q., Transcript,* 11/17/88 at 138; no objection was made to our instruction on "conduct and participate."[5] While our instruction admittedly varies from the new standard in *Reves,* Mr. Pungitore has plainly suffered no prejudice requiring us to remove the procedural bar. *See, discussion, supra.*

Third, *Reves* was decided after Mr. Pungitore's conviction had become final. The instruction we gave was correct under the law at the time it was given. *See United States v. Scotto,* 641 F.2d 47 (2nd Cir.1980) *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Therefore, we look for a fundamental defect or the complete miscarriage of justice before we apply the new rule retroactively. *See Davis,* 417 U.S. at 340, 94 S.Ct. at 2302; *Woods,* 986 F.2d at 676.

▮ Again, we have no difficulty in finding that there was no fundamental defect, because by Mr. Pungitore's own admission, he is a made soldier whose activities were conducted "under the direction of upper management." *See Reves,* 507 U.S. at 184, 113 S.Ct. at 1173; *Napoli v. United States,* ("*Napoli II*"), 45 F.3d 680, 683 (2nd Cir.), *cert. denied,* 514 U.S. 1084, 115 S.Ct. 1796, 131 L.Ed.2d 724 (1995). The evidence of Mr. Pungitore's guilt in the offenses with which

---

**5.** We instructed the jury as follows:

Now this term conduct and participate in the conduct of an enterprise includes the performance of acts, functions or duties which are necessary to or helpful to the operation of the enterprise. A person may be found to conduct or participate in the conduct of an enterprise even though they may have no part in the management or control of the enterprise and no share of the profits.

he was charged was overwhelming. *See Pungitore*, 910 F.2d at 1099. The erroneous instruction on management and control, in light of that evidence, cannot therefore be characterized as a fundamental defect that inherently gives rise to a complete miscarriage of justice.

### D. Double Jeopardy

Mr. Pungitore's next and final complaint stems from the recent Supreme Court decision of *Rutledge v. United States*, — U.S. —, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996). He argues that because the Supreme Court held that conspiracy to distribute controlled substances (21 U.S.C. § 846) is a lesser included offense of the continuing criminal enterprise offense ("CCE") (21 U.S.C. § 848) and therefore convictions of both cannot amount to consecutive sentences, we should reconsider the Court of Appeals' decision in *Pungitore*, 910 F.2d at 1115–17. *Petition Addendum*, at 3. We disagree.

The question of whether the double jeopardy clause of the Fifth Amendment prohibits consecutive sentencing for RICO conspiracy and substantive offenses (18 U.S.C. § 1962(c) & (d)) has already been litigated and decided on Mr. Pungitore's direct appeal. "Once a legal argument has been litigated and decided adversely to a criminal defendant at his trial and on direct appeal, it is within the discretion of the district court to decline to reconsider those argument if raised again in collateral proceedings under 28 U.S.C. § 2255." *United States v. Orejuela*, 639 F.2d 1055, 1057 (3d Cir.1981) (*citing Kaufman v. United States*, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 1074 n. 8, 22 L.Ed.2d 227 (1969)). There is a great interest in the finality of litigation; matters fully addressed and decided on direct appeal should not be reexamined lightly.

In *Pungitore*, the Court of Appeals discussed the issue of consecutive sentences for RICO and RICO conspiracy in detail. Specifically, they addressed the question in light of another Supreme Court decision, *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), and held that the vast differences between § 1962 and §§ 846, 848 merited the conclusion that while consecutive sentences were not valid for the latter, they were for the former. The court further held that the statutory provisions in § 1962(c) and § 1962(d) defined different offenses under the law; there is nothing within the CCE statute that required otherwise. Given the depth of their discussion, we see no reason to revisit the issue.

We find, however, that even if we were to reconsider pursuant to *Rutledge*, there is nothing in that opinion that would give us pause. Contrary to Mr. Pungitore's interpretation, the case is quite frankly in line with the Court of Appeals' assessment of § 846 and § 848. The *Rutledge* court followed the logic in *Jeffers*, and makes no comparison or connection between the CCE and RICO statutes. As such, we decline to reevaluate the measured opinion of the Court of Appeals.

### III. CONCLUSION

Our thorough review of the record in this matter points us indisputably to the conclusion that Mr. Capone did not provide Mr. Pungitore with ineffective assistance of counsel. Further, we see no reason to conclude that there was not sufficient evidence to convict Mr. Pungitore, nor was the jury instruction in error under the law at the time. Finally, we decline to revisit the issue of the consecutive sentences Mr. Pungitore received following his conviction of RICO and RICO conspiracy as the Court of Appeals has already considered it so completely.

For the foregoing reasons, we will deny Mr. Pungitore's petition for relief pursuant to 28 U.S.C. § 2255.

An appropriate order follows.

### *ORDER*

AND NOW, this 20th day of May, 1997, after a hearing in open court, upon consideration of defendant Anthony Pungitore, Jr.'s Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255, and the government's response thereto, it is hereby ordered that the same motion is DENIED.